Our first case is 27-35 Jackson Ave v. United States, 2023-11-22. Mr. Varkatopane. Thank you, Your Honor. May it please the Court, I'm Jeff Varkatopane from Varkatopane, Appanese County on behalf of 27-35 Jackson Ave, which I'll refer to for brevity as Jackson. Your Honors, when this contract was formed, the word untenatable meant something. It was a word that has been used in landlord-tenant law for over 100 years. We provided the lower court with a plethora of case law, mostly in the highest courts of the various states throughout the nation that have wrestled with the question of what this term means. The question is who decides, and clearly the government had the right to decide. Our position, Judge, is that the government had the right to determine whether the space and the condition of the space satisfied the untenatability definition. The definition of that term that should have been used is the definition as it's existed in landlord-tenant law for over 100 years. There are no cases that have found that that term is synonymous with simply unusable. It involves a much deeper inquiry, as it should. We're talking about an extraordinarily drastic remedy. I'm not sure I understood your first answer to Judge Lurie's question. Are you saying that the determination to be made by the government does not affect the right or the responsibility of the court to make a determination of whether there was, in fact, an untenatability circumstance here? My response is that the government has an obligation to make a determination whether the space is untenatable. They have to use the definition of the term untenatable. If that's your position, I don't understand the difference between a contract that says that the lease can be terminated if the conditions are untenatable, period, versus that the government is entitled to make a determination as to untenatability. Are you saying that those are essentially the same inquiry? I don't believe they're the same. What additional rights does the government get by virtue of the untenatability determination that it is entitled to make under the contract? The government has the right to make the inquiry into the facts on the ground. But that would be true even if the contract said lease terminated for untenatability and no reference to the government's determination. I'm trying to get from you whether you're suggesting that this is the same standard that would be applied even if the determination clause were not in the contract. No, Your Honor, I'm not. I believe that if you apply the correct definition of the term untenatability in the government's analysis, that it is their determination that governs any dispute. But what they can't do, and what the court said in Latham, where the government had the discretion to determine fair market value, is they can't just make a determination that has no basis upon whether or not the amount that the government assigned is fair market value. And the court said fair market value has a definition. And here Jackson is arguing untenatability has a definition. And in addition to space being temporarily unusable because of something like a flood, there's a much deeper inquiry that requires the government to determine whether the space can be restored in a reasonable period of time using ordinary repairs without unreasonable interruption with their use of the space. And those determinations in this case were never made. When we deposed the contracting officer and we inquired... Just to be clear, if the evidence were such that your definition of untenatability was used by the government decision makers, you concede they unilaterally get to determine what the space is in. And so you wouldn't be able to question the outcome of that determination or the weight they put on any of the various factors that go into your definition of untenatability. I would, Your Honor, with the caveat that the determination still is bound by reasonableness. And when you read any of these case law that have discussed untenatability and what it means and why it's not synonymous with simply unusable for a moment of time, something the Allotment Court wrestled with and they said, if we were to adopt that definition, we would essentially be rewriting all the existing contracts out there. Because that's not what it means. But getting back to your point... So why shouldn't we read this, though, as when you signed a contract giving the government the unilateral right to make a determination, you also contracted away the right to let them define what untenatable meant? Because to suggest that the term didn't have a meaning when the party signed a contract would violate fundamental principles of contract law. The parties had to agree that this particular condition has to arise in order for the right to cancel to be invoked. And that condition, what is that condition? It had to have a definition when the parties made their agreement. And what we've supplied to the court is that definition has multiple factors that must be determined and here the government's contracting officer didn't determine them. He placed the onus on the landlord and said, provide a report to me and give me this information I need to make this determination. He deemed that report insufficient and having no knowledge about the length of time it would take to make the repairs and whether in the rubric of untenatability, whether it would be unreasonable to allow for that in the context of seven and a half years that remained on the lease, he never made the determination. He simply said, I don't have enough and I'm terminating the lease. And that does not... You say seven and a half years on the lease. I gather the lease was executed in 2009 for ten years with an option for the government to extend five years beyond that, right? That's correct. And this all occurred in 2017, so there were really only two years left as to which the government was obligated on the lease. It had an option to extend for another five, right? I believe that the contract was executed on 2009, Judge, but the build-out took three years. So the government didn't take, didn't declare it the beginning of the lease until 2012. So they were in fact only three years into their ten-year term. So the three years of the... It wasn't 2012, but this... 2015. When did the plot occur? 2015? January 8th of 2015. So your damages claim doesn't include the five-year optional period? Of course not. That was their discretionary choice. Let me ask you, you write in the opening brief at page 50, Jackson's reasonable expectation was that the government would abide by the well-established definition of untenatable and you've suggested as much today. Is there any evidence of that? How do we know that that was the expectation and what made it reasonable to believe that the government had agreed to that definition? Thank you, Your Honor. Our position is that's the only definition of untenatable. What the government has used here to conflate untenatable with unusable has materially changed the definition of untenatable. And what I will use to answer Your Honor's question, if my client had inquired with experts in the field of landlord-tenant law and asked attorneys, what does this term mean? What is it that would have to happen in order for the government to be able to cancel the rest of my lease? I'm about to spend $10 million to do a build-out for this ten-year period. Any attorney who did an inquiry into that term would come back unequivocally that it means damage so great that it cannot be restored in a reasonable period of time with ordinary repairs. They would also see things like... You may be right about what experts would have said, but we're reviewing a record that comes to us on a grant of summary judgment against you, correct? Yes, that's right, Your Honor. There's no such expert report that I saw in this record, is there? No, but it is the meaning of the term when the parties entered the contract. You look to landlord-tenant law to what does that mean, and you will never find cases that comport with it's merely unusable. When you look at the Mottman case, which we cited, which was a Supreme Court case, I believe, in Washington, they wrestled with this very issue where a tenant was saying, hey, look, if it's unusable even for a day, it's not untenatable, or it is untenatable. The court said, having reviewed the common law definition of untenatable, and as it has been interpreted in every court that's wrestled with this issue, they said, no, that's not what it means. It means something far more significant than that. And the treaties that have discussed it say structural damage is something that's a prerequisite. So when the parties signed the contract and included this term untenatable, they should be bound by the ordinary meaning of that term in landlord-tenant law. And I would also submit, Your Honor, if there are two reasonable definitions of that term when the parties signed the contract, this was a contract prepared by the government. And the landlord would get the benefit of the expectation she had about what that term meant based upon how it's been used for over 100 years. And had the government wanted a contract that allowed them to cancel the lease in the event that the space was unusable even for a moment, a day, a week, they could have used that language. They didn't. And they should have to live with the consequences of that decision. And if there's any ambiguity in what that term meant, it should be resolved in favor of the landlord based upon the law that we've cited here. What would you regard as being a period of time in which the premises were unusable that would constitute sufficient period to be rendered the property untenatable? Your Honor. Under the circumstances of this case. Of this case, that really is a determination that the government should have made. And that's the thrust of our argument, is that they never made a determination as to how long it would be unusable. They immediately demanded that the landlord repair the space not to usable, which would have been the appropriate inquiry. And again, their inquiry could be independent upon what it is they're asking of the landlord. Does the fact that the contract only gave them 15 days to make this determination tell us something about maybe you really were giving them the right to just on their own decide what made something untenable? That's an awfully quick time to do the kind of multi-factor analysis that you're saying they agreed to do. Well, if the definition were as the government would have the court find, you wouldn't really need more than a day. I think the fact that there's 15 days actually supports our contention that this is a very involved determination that involves more than just can we not use this space for today, tomorrow, or a week. But I would suggest getting back to Your Honor's question that in those cases where it's questionable, where the period of the time on the lease that remains is say, for example, a few years and it's going to be six months or eight months, that's when the as determined by the government comes in and binds the landlord. The landlord can't say, well, we don't think that's an unreasonable interruption. And that's up to them. But I would submit to this court that if you look at any of the cases in these highest courts around the nation that have wrestled with the definition of this term, that water damage that has aesthetic damage that can be corrected, we're talking about sheet rock, drop ceilings, and carpet squares, that this stuff could have been corrected in days if we're talking about just usability. Well, your estimate, I take it, was essentially a month, right, from the date of the event until the remediation was complete. That was the estimate that you're... Not entirely, Judge, because there are two floors that we're dealing with. February 7th? February 7th was a date that came later on after the government began putting hurdles in the place of the landlord. And we submit that that's part of our good faith and fair dealing claim, that the government came back to the landlord and said, and added obstacles such as getting laboratory testing of whether or not there was an existence of mold, despite the fact that CertPro is certifying no mold. The landlord began to replace walls and the city had to stop until the government approved. So the initial plan that my client had given the government, based upon its original estimation without these additional obstacles, was actually that the first floor would be completed by January 20th, constituting nine days of an interruption. That's the first floor. That's the forward-facing part of the government space that... Counsel, you're well into your rebuttal time. I assume you'd like to save it? I would. Thank you. Ms. Fleming. Good morning, Your Honors. May it please the Court. This case is about whether a contract means what it says. And as the Court has pointed out in opposing counsel's argument, in fact, the language in the contract can't be severed. You can't look separately at the word untenable and separately at the phrase, as determined by the government. They're part of the same sentence, they're part of the same clause, and they're meant to be construed together. In fact, if you look at... If you take the natural conclusion of the petitioner's argument here, essentially they are deleting, as determined by the government, from this phrase. If, as the Court pointed out, untenable was the only measure of whether the premises was partially destroyed, then that would have been the end of that sentence, and the petitioner would be right to suggest that some legal standard should be applied. Go ahead. Which standard do you think applies here? The government presumably can't simply say, Well, the air conditioning was off for an hour and a half. Place is untenable. You wouldn't argue that that would be sufficient under this contract to constitute a binding determination of untenability, would you? Well, Your Honor, there is no standard articulated in the contract. But I actually would like an answer to that question first, and then you can tell me why. At the baseline, the government has to make a good faith determination. In this case, the Court looked at whether the premises could be occupied for the purpose the lease was originally designed. But for a period of time to be determined as sufficient by the government, even if it is two hours that the air conditioning is off? I think that, as Judge Stark suggested, the limitation of 15 days the government had to make this decision is instructive. Now, it doesn't suggest that whatever damage had to be completely repaired within 15 days, but it does provide to both parties to the lease a hint of the time period in which the government had to make that decision. Essentially, the way that the clause is constructed, if the government did not exercise its right to termination for partial destruction within that 15 day period, it waives that right. So there's no other part of the lease that allows the government to exercise that right after that 15 days had passed. What that means is the government has to be highly confident within that 15 day period that whatever partial destruction occurred will be remedied in some timely fashion. In this case... In this case, it seemed, if I understood the record correctly, you determined within one day that the premises were untenable, correct? That's correct. The flooding in the unit was so extensive that it affected basically every working part of the offices. The government couldn't conduct its business. It has urgent business. It has visa applicant appointments daily, and there are hundreds of visa applicants that come to the office in that period of time. It had to immediately find other premises on which to conduct that business. Fortunately, it was able to do so, but it schedules appointments months in advance. The business of the office could not... What about the suggestion from the other side that the 15 day period actually cuts against you and suggests that you agreed to this well-known standard, which is multi-factored and would require a certain amount of investigation and balancing of how long is it going to take to get back to where you could use the premises, how much time is left on the lease, maybe how much they invested to get the premises ready to your satisfaction, and that they never would have agreed to give you the unilateral power to make a decision in 24 hours that the facility was not tenable? Certainly, I don't think the government would argue that the only standard for the time period to make that decision was 24 hours. That was possible in this case because the flooding was so extensive and so obviously not occupiable. Apparently, the petitioner agreed because they didn't object to the government decamping from the space. They never asked them to reoccupy the space while SERPRO was engaged in remediation. That was entirely consistent with the state of the offices at that time. To look at the cases that the petitioner suggested the court should examine for what the time period for remediation is, is deceptive. The cases that the plaintiff relies upon do not include any as determined language for one thing. Secondly, they often look at a long period that allows the lesser the opportunity to correct the damage at the space. But here, the government did not have a long period in which to, for instance, engage with the plaintiff on its restoration and repair plans. It had to work with the information that it had at the time. I would say also that this clause doesn't actually provide any confirmation that the government must consider restoration or repair plans by the petitioner in its determination of intendability or its termination decision, but it did. In fact, it gave Jackson multiple opportunities to ensure it that it would be not only remediating the water damage, that is removing the wire logs, tiles, and carpets, and walls, but also replacing those things, while Jackson made some suggestion that the restoration phase was minimal. In fact, it involved putting new walls up and adding floors and ceilings that didn't exist. So it was quite a considerable investment. What is your response to their fundamental contention, which I take to be the government, that there is a well-known industry-wide understood meaning to intendability, and that the parties, the only way to interpret this contract is that the parties, including the government, agreed to that definition? By the way, there is no evidence. I think the government can see that there is no evidence that you did make a determination of intendability if that definition that they want of intendability applies, correct? We agree that we do not apply the petitioner's proposed definition. So why should we not interpret this contract as one in which you agreed to do that and you failed to do it? Because the contract here, unlike every single case that Jackson relies upon, allows the government to make that determination. And that phrase, as determined by the government, means nothing if that common law definition of intendability doesn't apply. Because that reads out the word intendability, doesn't it? How would the contract be any different if it just said, as determined by the government, the government determines to terminate upon partial destruction or damage, if we just struck, you know, the intendability clause entirely? How would the contract be any different? It makes it a subjective determination, Your Honor. So the government has to determine in good faith whether it was intendable. But the good faith, and this gets us back to the answer you gave to my first question. What is entailed in good faith? Is it good faith application of the principles of intendability? Or what is your view as to what's required by good faith on the part of the government? I don't believe that suggesting good faith is the standard and then applying the common law principles would add anything to the analysis, since one presumably always is acting in good faith and government actors are assumed to be doing so. Well, give me an idea of what would be required to show that the government did not act in good faith with respect to the intendability determination. Well, for instance, if the damage to the space was limited to one room in 20 rooms and the government determined that it was untenable, that clearly is not acting in good faith, though most of the space is tenable, right? And was it pretty clear that the situation could be remedied within a matter of a couple of days? I think the question of, and I agree with your contention, that if it was very clear that the situation could have been immediately remedied, particularly within the 15-day period in which the government had to decide, then that would not have been a reasonable or good faith application. Here, what the government was looking for in particular was a plan from the plaintiffs that would allow it the comfort of knowing that these repairs, this restoration would be complete in some predictable period of time. They asked for that multiple times. They asked for it as soon as three days after the actual flooding events occurred. And in each case, Jackson did not provide any plan for restoration. The most that they did was provide, on June 12th, a document that simply repeated what it received from CERPRO in terms of remediation planning. CERPRO's remediation plan had daily tasks that had a full schedule. The government understood what CERPRO was going to do. For restoration, Jackson only said, we will complete first and second floor restoration by January 30th. Not only did that not turn out to be the case, but in fact, that is not a plan. There's no indication that they hired a contractor. There's no indication that they ordered materials for which there is a wait time that are specialty materials. There's no indication they did any work to assure the government that they actually were going to follow through and complete the restoration plan in the time that they projected. In this particular circumstance, it's very clear that the government made a good faith determination in the time it was allowed. Jackson simply refused to respond with a meaningful restoration plan, even when the government, on January 13th and 14th, specifically requested they address restoration, including when ceiling tiles, sheetrock, other materials that are specialty materials would be restored. In this case, it is pretty clear. I think also, if the court looks at Brown versus United States, in that case, GSA terminated a contract after, again, within a 15-day period clause. In that case, the government requested a plan to repair the leak and fix the premises within seven days. The lessor did not provide one, and it terminated the leak 17 days later. The period that we're looking at is certainly a period within which other courts have found the government could reasonably conclude on tenantability. I want to take you back to my question, because I want to make sure I understood it. I'm looking at the key sentence. In the case of partial destruction or damage, so as to render the premises untenable as determined by the government, the government may terminate, right? How, if at all, would the government's rights be different if I simply strike the phrase, so as to render the premises untenable? It would then read, in the case of partial destruction or damage, as determined by the government, the government may terminate the lease. Would that give you any lesser rights than you currently have? In that case, I think that the word untenable suggests to the government a meaning which, in this case, was unfit for occupation for the normal use of the agency. That reading wouldn't have been necessary if the provision only included in the case of partial destruction or damage. Unfit for any period for the purposes of the agency. That's what the government understood untenable to mean. Unfit, and within the 15-day period, the government had to consider it. But within the 15-day period, wouldn't it be necessary for the government to make at least a good faith estimate that it would be unusable for an extended period of time? Isn't that, aren't we really talking about period of time here when we're talking about the difference between unusable versus untenable? Certainly, extensiveness of the damage is also a dimension of that. But if you look at period of time, one of the challenges here was the government is not a contractor. They don't know how long it takes to restore the walls and ceilings and carpets. That's why it asked for the plaintiff, for Jackson, to provide that information so we could assess whether the timeline was reasonable and whether it could afford to, again, waive any ability it might have to terminate the contract after the 15-day period. Jackson did not comply. GSA is not a professional, not professionally in construction, it doesn't know how long that time, the time it takes to repair that damage. It could have responded if Jackson had provided a timeline with an assessment of whether that would fit the agency's needs, but it never got that opportunity because Jackson declined to provide that information. As I mentioned, Brown, in addition to having a short timeline such as this, also did not apply a common law standard of untenant ability to the decision to terminate the lease. Rather, the government prepared a letter that explained that there were repairs resulting from a leak during a blizzard. The lessor had not fixed it or provided a plan to complete the repairs and the court found that that was sufficient. Likewise in Richardson, a similar situation where a letter described 14 different deficiencies which did accrue over time, but the letter was the formal notification and the lessor refused to respond by fixing the problem and the court supported that termination. No reference to the common law standard for untenant ability. Jackson also relies on a number of cases suggesting it has copious controlling authority to show when untenant ability must be interpreted consistent with its preferred definition. It relies upon reserve ranch, which is a case that was affirmed by the Federal Circuit, but that case turned on whether statutes delegated authority to two agencies to assess endangered species, not untenant ability. One of the arguments that's made under the rubric, I think, of good faith and fair dealing obligation is that the termination is pretextual. Do you think that pretext, if proved, would be sufficient to render the determination, in this case, not in good faith? Yes. The entire defense that, or the entire claim that Jackson made out under good faith and fair dealing is about animus by the government, bad faith by the government, and the contention that termination was pretextual, but it could not actually demonstrate anything. That would be sufficient to constitute a violation of the duty of fair dealing. I would agree, yes. There is no, avoidance of doubt, there's no such evidence here. GSA was the decision maker, not USCIS, who was the tenant. There's plenty of law dismissing the idea that routine complaints by a tenant suggest animus of the kind that would rise to bad faith. GSA, instead, engaged in a process, investigated the claim, it gave Jackson the opportunity to respond with repairs, it evaluated that claim, and it did so despite USCIS's preference that the lease be terminated. There was no bad faith, and no evidence of bad faith in this case. If I could also point out the- So as you can see, your time has expired, so we thank you for your argument. Thank you, Your Honor. Mr. Patipane will give you two minutes for rebuttal. Thank you, Your Honor. The 15-day period of inquiry in the cases cited by the government, Brown and Richardson, the GSA deployed professionals. I forget which one, but one involved an earthquake of a building that was condemned and couldn't be used at all. And the GSA's experts on the field went out and prepared reports and made a determination about the length of time the space would not be able to be used, not occupiable, unfit for use, to suggest that putting the onus on Jackson to prepare a report to the government to make that determination for it is contrary to the language of the contract. And we've supplied case law to this court that that in and of itself is a breach. When the government is given the discretion to make a determination, it is their determination to make. They cannot put the onus on the determination on the contractor and then cancel the contract simply because they find that the inquiry made was not sufficient. I would also add, the idea that the 15-day period couldn't be extended is disingenuous, I believe, because you're dealing with a landlord who's facing possible termination and had the government said we need an additional 10 days, otherwise we have to cancel today. I can hardly imagine a circumstance where a landlord would say we're not going to agree to give you an additional 10-day period. This original report that was submitted had the completion of the first floor on January 20th, 12 days after the original damage occurred. And the contracting officer in his deposition said that he thought that that just was dealing with remediation and not restoration. And this is part of our good faith and fair dealing claim because on one hand, the government will have you believe that they had boots on the ground and knew exactly what was going on. And on the other hand, the contracting officer testified under oath that he thought that the February 7th date was only remediation. And on that date, when he canceled the contract on January 15th, remediation was complete. It had been complete since January 12th. ServPro was gone. ServPro was wrapping up remediation on January 16th, and it would be complete. Restoration would begin thereafter. The original plan provided for restoration of the entire first floor back to as built, which is something far greater than tenable, which is required under the contract. By 12 days after the event, I think some nine business days, the second floor, again, as built. The government demanded as built. Counsel, your red light is on. The case is submitted.